# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,
          Plaintiff,

vs.                                             Case No. 21-CR-0049-JDP

BRETT BLOMME,
          Defendant.

## DEFENSE SENTENCING MEMORANDUM

Brett Blomme submits this memorandum in support of sentencing. Blomme, at 39, admits both his guilt and his underlying struggles with an addiction to illegal child pornography. He surrendered himself into custody in May without a fight, though there was one to wage. And, despite certain political voices raised herein prematurely (and in willful disregard for Brett's then-still-extant presumption of innocence), Brett fully accepts responsibility for his crimes. He has begun the process of surrendering his law license based on his convictions. He wants the serious help he needs, for his porn addiction (with its underlying root causes) and for his alcohol abuse. Brett has made forward-looking, constructive plans for life after prison. And yet, throughout his time in custody, he has remained a constant in the lives of his children, spending time daily in video chats with them. Further underscoring Brett's full if flawed character (we all have flaws), he has also organized healthy activities for the Sauk County jail inmates who are his current "roommates."

This Court must impose at least five years in prison, and can go much higher, as the government urges; it cannot go lower. We ask you to impose what the ABA Criminal Justice Standards and the caselaw require, to wit: no more than is minimally necessary so as not to depreciate the seriousness of the offense, while balancing the length of his incarceration against all of the other factors in Section 3553 and the cases under that section.

But this is where intellectual and jurisprudential friction arises.

### *Artificial Anchors and Judicial Decision-Making*

This Court has talked on several occasions about the concept of "anchoring" and its role in sentencing decisions. Indeed, this Court has candidly admitted its own struggle not to be over-influenced by the psychological effect known as "anchoring" (in sum, the tendency to view the two sides' sentencing arguments as the "anchors" of the range from which a sentence ought to be selected). Anyone who has sat through a sentencing in this Court knows this Court works assiduously to craft a sentence using the 3553 sentencing factors, while also seeking to achieve sentencing parity – a near-Herculean task, but which remains this Court's task.

A disruption of sentencing judgment stems from the artificial anchor automatically (and undeniably) created by the five-year mandatory minimum sentence. If there were no mandatory minimum, this Court would be free to use its best sentencing judgment and determine individual sentences for each person convicted of this crime using only the 3553 factors. There seems little

doubt that some would end up with prison sentences below 60 months, while others (perhaps with prior, similar or dissimilar) would get more.

Yet the mandatory minimum elevates to 60 months the sentences even of those who, under Section 3553, would not merit that much prison. In short, the mandatory minimum law creates a theoretical pool (a virtual logjam) of defendants who must be given 60 months despite the court's 3553 judgment that a lower sentence would be more appropriate.

But that is not all the mandatory minimum creates.

It *also* creates that above-described psychological "anchor" – derived from a political judgment, not a judicial one – by which a court implicitly, even perhaps unwittingly, feels compelled to reserve the "lowest" sentence on this crime (60 months) for the "least worst" case (of receiving or sending child pornography).[1] This "anchor" is artificial, and was artificial when Congress enacted mandatory minimums for distribution of crack, LSD and other mandatory minimum crimes. It seems intellectually (and psychologically) more accurate to view the mandatory minimum (here, 60 months) as the retention pond where all of the "less worse" **_as well as_** all of the "least worst" cases must collect by the reverse filter of a mandatory minimum.

Here, the artificial anchor is heavy (if obvious): this Court hears "full unmitigated guideline" sentence of 121-151 months from the Government, hears "at or just above the minimum 60 months" from the defense (our

---

[1] In fact, defense counsel had a recent drug case here where there was a mandatory minimum, and counsel recalled this Court noting it reserved the minimum for cases which were not as bad as the one under review.

request), and begins the perhaps unwitting psychological triangulation to a mediated sentence somewhere between 60 and 151. And yet to constitute truly valid balancing under 3553, the two endpoints ought to be "one day" and the maximum sentence (here, 240 months). Only after a court completes that calculus, and only when and if the resulting judicially mediated sentence ends up below the minimum, must a court then move it up into the "retention pond" of "less worse" and "least worse" cases that collect at the minimum.[2]

This argument could raise another concern, though. If the defense point is valid – about the effect of this artificial "anchor" of 60 months in cases like this one – the Court might then realize that this "artificial anchor" resulted in other recent sentences above 60 months when they more properly ought to have landed in the "retention pond" of the minimum, 60 months. How would this Court account for those higher sentences if it found this argument valid, then decided it ought to go lower with Blomme? Put another way, even if this Court concludes that Blomme while not the "least worst" or even the "less worse" case ought to be sentenced below a prior sentence of a similar ilk, how is that fair in hindsight to the defendant who got more time?

The answer is an uncomfortable one, but resides in the big picture: just as *stare decisis* holds sway only until the true error of an earlier decision is made clear, so too should a artificially elevating (political) method of deciding the sentence be discarded if it is not well-founded. If the court in

---

[2] The reverse of this is seen in mandatory minimum cases where the advisory guideline range falls below the restricted guideline range required by a mandatory minimum.

4

prior cases was improperly influenced by this artificial anchor, it is time to lift that artificial anchor going forward and a truer method used instead. It might not seem fair (in the moment) to those sentenced earlier, but in the big picture, the entire process of sentencing fairly and properly is improved.

### **Weighing the Factors Here**

*The impact of the Advisory guideline Range.* First, we anticipate a government request for a sentence in the advisory guideline range. As Judge Adelman noted years ago, the increases in the offense level seem to fit nearly every federal child pornography case. The PSI notes, correctly, that the two-level increase for use of a computer amounts to de facto double counting. The same can be said for certain other increases for "specific characteristics".

It has become a rare case where materials do *not* contain prepubescent minors (a 2-level increase); counsel's cases over the past ten years have all had such imagery. This Court would have a better sense as to the whether this assertion is well-grounded. But if it is, then this increase also seems superfluous. In a similar vein, if an image depicts prepubescent minors – the usual imagery leading to this 2-level increase – it almost always constitutes either sadistic or masochistic conduct or the sexual abuse or exploitation of that same prepubescent minor – arguably another form of double counting, which adds 4 more levels. Had those 6 points not been added (we do not challenge the Guideline calculations, only the utility of them under a 3553 analysis), the resulting offense level would be 28 with a resulting advisory

5

guideline range of 78-97 months here – a notably lower range than likely to be urged as the "right" sentence by the government. And as that is the usual government request, it too may stem from this "artificial anchor" influence.

*Deterrence, General and Specific*. The news of Blomme's arrest and his crimes traveled like wildfire. Few who read or watch news could have escaped the juxtaposed click-garnering headline, "Children's court judge charged with possession of child porn." Such headlines earn no sympathy for the accused, and they should not. (Note: the only claim about the courthouse is that Blomme used a phone on the courthouse WiFi while involved with this illegal imagery.) From that headline, the general public will never think any prison term is long enough – which is why we have a politically engineered anchor of five years in prison in the first place: that law got people elected. But when Blomme's crimes are studied under the judicial microscope, some important facts emerge which, viewed dispassionately, support a sentence that is a combination of punishment and treatment – with much supervision.

First, as Dr. Trevino writes, the fact of sexual arousal to prepubescent minors is a human condition which, contrary to societal stereotypes, is very susceptible to mitigation in therapy, especially with a willing, motivated and engaged person. Here, although the Court must order at least 60 months, the science and data regarding treatment of non-contact offenders such as Blomme shows that with proper treatment and supervision, the risk of re-offenses of this sort can be reduced substantially.

6

In contrast, the longer a person is locked away from society and, hence, must learn important (antisocial) survival traits in prison, the less likely is the therapeutic success; in fact, the science shows that risk of re-offense goes up past a certain point in prison.

Second, as Dr. Trevino also notes, the other factors in Blomme's life which lead to these offenses – mental health issues compounded by severe alcohol abuse – are themselves also subject to successful control by therapy, both in and after prison. Here, where Blomme will be under strict supervision for potentially a very long time after release, and will always be a registered sex offender, he will be closely supervised (by agents) and closely scrutinized (by the general public and his own close circle of support). These, Dr. Trevino notes, are the components of long-term risk reduction.

Blomme will receive clear specific deterrence both in prison and back in the community. Should he stray into danger areas with any of his issues (alcohol, porn, secrecy), those close to him and those supervising him will see that and work to arrest it – or arrest Blomme himself. For a first-time offender, and at his age, and with his education, and his support system, his specific deterrence does not require prolonged custody. It requires community supervision as he ages.

The other form of deterrence is general community deterrence. But to evaluate this properly, one must first ignore the community outrage whose flames were fanned across media sources. If this offense is one which stems from the conflux of real psychosexual issues and a loss of self-discipline

7

(through things such as isolation and alcohol abuse), as Dr. Trevino opines, then its impact will be far less than, say, news of a doctor who went to prison for cheating a federal insurance program. Unlike the potential for deterrence from a prison term for fraud (a crime which stems from calculated risks motivated by greed), it seems illogical to conclude that a long prison term for a child porn offense will deter similarly mentally troubled, psychosexually impaired persons who need help to stop. (Those are the persons who view and share this imagery.) A longer term of prison is unlikely to have any general deterrent effect, although the fact that prison was ordered (instead of probation) for a child porn crime could have some collateral deterrence.

*Case-Specific factors*. On arrest, Blomme became the subject of a game of political football. In addition to his public shaming as noted above, he then had to watch an ensuing tug of war between federal and state authorities. Add to that jumbled litigation vortex a state court bureaucrat (Wisconsin State Courts Director Koshnick) who unilaterally chose to assume the mantle of a third prosecutor in the room (ignoring law, facts and basic constitutional principles in the process).

These political battles have left Blomme publicly scourged, scrutinized and scalded in ways that are unlike what happens to most who are similarly accused. Those facts mitigate any need for extreme punishment.

First, as the facts in the presentence show, this was a state investigation from the start. Upon arrest, Blomme was taken to Dane County Circuit Court, where the state AG charged him with possession of child pornography. At his bond hearing, two things were noted by the court: one, Blomme got a signature bond; and, two, this signature bond order stemmed in part from the fact that the usual sentence for a first offender in a Dane County child porn case is three years – hence, not a term of years so long as to create any risk of flight by Blomme.

Upon his release, Blomme learned from an email that although he had only been *charged* with a crime (and thus presumed innocent) the Supreme Court of Wisconsin and its director (Koshnick) immediately blocked his pay and benefits. They did so, despite taking <u>*none*</u> of the four actions available to them to remove Blomme from his duly elected office (and his pay) as a judge in Milwaukee. He may have been lawfully removed from his assignment, an order arguably within the power of the Wisconsin Supreme Court. But there is no power to stop the pay of an elected official. They did so anyway.[3]

Then, within a week or two, Blomme learned through counsel that the "feds" had been asked to indict him, in a move apparently intended to get a longer term in prison then three years in this, a high profile media case.

---

[3] Despite much research, defense counsel found no other elected state judge whose office pay had been unilaterally blocked by the state Supreme Court simply upon the filing of a criminal charge versus a judge. This *ultra vires* action continues to look like a public relations ploy by the Court.

Over the next few weeks, as reflected in the plea agreement, the state and federal prosecutors worked out a way to resolve both cases together. Of course, that lead to a renewed wave of public shaming, as he entered his pleas and moved toward resolution of both – yet it was still the same case.

Given these machinations among state and federal matters, Blomme's prompt decisions – to agree to detention and then to agree to resolve both cases together – are the best evidence of his acceptance of responsibility for his crimes. But along the way, even before he was indicted, he sat down and gave a full immunized proffer to the U.S. Attorney and the state DCI agents in this case. That was the earliest signal to the government that he accepted full responsibility for his crimes. His statements to the presentence writer and, now, to Dr. Trevino, show his more of true character, in that he is taking full ownership of his crimes and addressing his underlying root struggles.

What has he lost, collaterally? A lot. He had worked hard to get through law school and make his way into a higher professional echelon. That is gone, obviously; and it may be for the better for Blomme in the long run, but it is still a significant loss. He will offer to surrender his law license before sentencing in a self-report to the Office of Lawyer Regulation.

And, despite his yeoman efforts to remain a father and a factor in his two adopted children's lives, that is soon to be put on a hard pause, as he is taken to a federal prison for a long time – longer than seems possible to kids their ages, anyway. This is his fault, yes, and he has caused them this pain.

10

But it remains an undeniable collateral loss. Depending on how long he is gone, they may find it hard to take him back into their lives, as well.

Brett has done much good for many who have been marginalized. He has helped others overcome the scourge of gender discrimination. And in a terrible irony this summer, he also become a frequent social media poster child for vicious right-wing attacks on progressive politicians, including the sitting governor of Wisconsin. People used a campaign picture – showing him with his husband and children – as a badge of shame in social media wars.

Yes, he has suffered collateral damage. And yes, he knows his crime caused that; he understands and accepts the consequences. But this Court is not required to *ignore* all of that in deciding the proper sentence. Those same things will make Blomme's road back home harder, and his future path more difficult. And yet, he accepts that and takes it as his next challenge.

Blomme's willingness and ability to accept that challenge is a mark of his good character traits. Those character traits are the ones his family and friends know, and they are also the source of the positive comments from each person who took the time to write you a letter about Brett Blomme.

**Concluding Observations.**

Each person who wrote to you knows those letters will be made very public; they wrote them anyway. What could make people feel so strongly about a person accused of such hated crimes, that they are willing to stand up publicly, by name, for Brett Blomme on his personal judgment day? It can only be that they know him well enough and deeply enough to know that he is much more and much better of a person than just the crimes he committed. He is. He should not be locked away to be warehoused for any longer than the bare minimum needed here. At this point, any time beyond the political minimum seems to serve little purpose, given the good Brett can still do going forward. We ask you to show him every mercy.

Dated at Madison, Wisconsin, December 20, 2021.

Respectfully submitted,
BRETT BLOMME, Defendant

*/s/ (electronically signed)*

By: _____
Christopher T. Van Wagner (#1024261)
110 East Main Street, Suite 705
Madison, Wisconsin 53703
(608) 284-1200; 608-284-1260